IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| JAMES and KAREN THELIN, as the natural parents and guardians of TLT, a minor,<br><br>            Plaintiffs,<br>vs.<br><br>NUTONE, LLC, a Delaware limited liability company,<br><br>            Defendant. | MEMORANDUM DECISION AND ORDER<br><br><br>Case No. 2:11CV1046 DAK |

This matter is before the court on Defendant NuTone LLC's ("NuTone") Motion for Summary Judgment. A hearing on the motion was held on September 4, 2013. At the hearing, Plaintiffs James and Karen Thelin were represented by Richard D. Burbidge and Aida Neimarlija. Defendant NuTone was represented by Gary L. Johnson and Jennifer H. Mastrorocco. Before the hearing, the court carefully considered the memoranda and other materials submitted by the parties. Since taking the matter under advisement, the court has further considered the law and facts relating to this motion. Now being fully advised, the court renders the following Memorandum Decision and Order.

## I. UNDISPUTED FACTS

This litigation arises out of an injury to TLT, who was five-months old at the time. TLT, her parents, and her two sisters, then ages five and three, had traveled to St. George, Utah from their home in Ephraim, Utah. On September 3, 2010, TLT's father checked himself and his three young daughters into the Coronada Inn and Suites in St. George (the "Motel") while his wife, a

nursing student, was undergoing training at the Dixie Regional Medical Center. Eventually, Mr. Thelin placed TLT in the bathroom of the motel room for her to take a nap in her car seat. He placed TLT's carseat on top of the toilet. Mr. Thelin testified that he placed TLT in the bathroom to separate her from the other girls and to make it as dark as possible for her to sleep. Mr. Thelin also turned on what he thought was the bathroom exhaust fan for ambient noise, but it was actually the heater blower component of the NuTone Model H-965 combination light/heating/fan (the "H-965 Unit" or the "Unit").[1] The bathroom dimensions are 5-feet wide by 5 ½-feet deep with a 7-foot ceiling.

Mr. Thelin left the door to the bathroom open some unknown number of inches because he could not shut it all the way with TLT's car seat located on the toilet seat. About fifteen to twenty minutes after placing TLT in the bathroom, one of the other girls, JT, needed to use the restroom. At that time, Mr. Thelin took TLT and placed her, still in her car seat, into the bathtub so that JT could use the toilet. Mr. Thelin testified that at this point he did not sense heat coming from the bathroom heater even though it had been running for fifteen to twenty minutes. After

---

[1] In the 1970's and 1980's, NuTone designed, manufactured, marketed, and distributed the H-965 Unit. NuTone has sold its products at home improvement stores, including Home Depot and Lowe's. The H-965 Unit that was installed in Room 108 was manufactured by NuTone within one to three months prior to October 1983. The Coronada Inn and Suites (the "Motel") was constructed in 1984. The H-965 Unit was installed in the Motel at the time of original construction. NuTone designed H-965 to run indefinitely, and the only way the H-965 would turn off is if the "thermal protector" protecting the actual motor reached the temperature of 278 degrees Fahrenheit.

As installed in Room 108 of the Motel, the operation of the light and exhaust fan component of the H-965 Unit was controlled with a single unmarked wall-mounted rocker switch. The operation of the heater and its fan were controlled with a separate, but co-located single unmarked wall mounted rocker switch. Also, the 1983/1984 installation instructions (unlike the H-965 installation instructions before 1983), made it optional for installer to use a two-switch assembly. The exhaust fan component of the Unit was not operational on the day of the incident.

JT used the bathroom, Mr. Thelin closed the door, almost all the way, leaving it open approximately one to two inches. Mr. Thelin then took a nap with his older daughters.

When Mr. Thelin woke up and checked on TLT, it had been approximately one hour, and the bathroom was as hot as a sauna. TLT was limp and bubbling at the mouth. Mr. Thelin put TLT and the other two girls in the car and began driving to the hospital. Mr. Thelin called 911 from his car. At the hospital, TLT's body temperature was determined to be 108 degrees Fahrenheit. TLT suffered permanent brain injury as a result of exposure to temperatures between 114 and 121 degrees Fahrenheit.

## II. THE LAWSUIT

Plaintiffs filed this lawsuit against NuTone, the manufacturer of the H-965 Unit, based on claims of strict liability, negligence, and breach of warranty. In the instant motion, NuTone has moved for summary judgment on all causes of action asserted against it. First, NuTone argues that it is entitled to summary judgment based on the Utah Builder's Statute of Repose (the "Builder's Statute of Repose" or the "Statute of Repose"), Utah Code Ann. §78B-2-225. In general terms, the Utah Builder's Statute of Repose bars any claims against a provider more than nine years after completion of the improvement. Here, NuTone argues, Plaintiffs did not file their Complaint against NuTone until almost twenty-seven years after construction was completed on the Motel.

Additionally, NuTone argues that, even if Plaintiffs' claims are not barred by the Builder's Statute of Repose, NuTone is still entitled to summary judgment because (1) the H-965 Unit was not defective or unreasonably dangerous; (2) NuTone is the manufacturer of a component of the Motel's HVAC system and had no control over any safety devices installed

with the final system by the Motel, its architects or engineers; (3) NuTone is not liable for its failure to warn about the dangers of the H-965 Unit because it did not know and should not have known of the alleged dangers posed by the H-965 Unit; (4) NuTone did not owe a duty of care to Plaintiffs and thus cannot be liable in negligence; and (5) Plaintiffs' breach of warranty claim is indistinguishable from their ill-fated products liability claim and consequently must be dismissed. Each of these arguments will be addressed in turn.

## III.  STANDARD OF REVIEW

A motion for summary judgment shall be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A non-moving party must demonstrate that a fact is genuinely disputed by "citing to particular parts of materials in the record" and cannot rely on allegations or denials in its own pleadings. Fed. R. Civ. P. 56(c)(1)(A).

"An issue of fact is 'genuine' if the evidence allows a reasonable jury to resolve the issue either way and is 'material' when it is essential to the proper disposition of the claim." *North v. Ford Motor Co.*, 505 F. Supp. 2d 1113, 1115 (D. Utah 2007) (quoting *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006)). In ruling on a motion for summary judgment, the nonmoving party's evidence "is to be believed, and all justifiable inferences are to be drawn in [that party's] favor." *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999) (internal citations omitted).

## IV. DISCUSSION

### A. The Utah Builder's Statute of Repose

NuTone contends that it is entitled to summary judgment because the Utah Builder's Statute of Repose, Utah Code Ann. §78B-2-225, precludes all Plaintiffs' claims. Under the Statute of Repose:

> an action may not be commenced against a provider more than nine years after completion of the improvement or abandonment of construction. In the event the cause of action is discovered or discoverable in the eighth or ninth year of the nine-year period, the injured person shall have two additional years from that date to commence an action.

Utah Code Ann. § 78B-2-225(4). In addition, "Provider" is defined as "any person *contributing to, providing*, or *performing* studies, plans, specifications, drawings, designs, value engineering, cost or quantity estimates, surveys, staking, *construction*, and the review, observation, administration, management, supervision, inspections, and tests of construction *for or in relation to an improvement.*" *Id*. § 78B-2-225(1)(f) (emphasis added to highlight the terms upon which NuTone relies). "Improvement" means any building, structure, infrastructure, road, utility, or other similar man-made change, addition, modification, or alteration to real property. *Id*. § 78B-2-225(1)(d).

The question before this court is whether the Builder's Statute of Repose protects manufacturers of products, such as the H-965 Unit, which are installed in a building.[2] In cases such as the instant case, which arise under diversity jurisdiction:

---

[2] Throughout the briefing, and for obvious reasons, NuTone calls the H-965 Unit a "Fixture," and Plaintiffs call it an "Appliance." The court will refer to the H-965 as the "H-965 Unit."

5

> the federal court's task is not to reach its own judgment regarding the substance of the common law, but simply to ascertain and apply the state law. The federal court must follow the most recent decisions of the state's highest court. Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do. In doing so, it may seek guidance from decisions rendered by lower courts in the relevant state, appellate decisions in other states with similar legal principles, district court decisions interpreting the law of the state in question, and the general weight and trend of authority in the relevant area of law. Ultimately, however, the Court's task is to predict what the state supreme court would do.

*Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 665–66 (10th Cir.2007) (internal citations and quotations omitted). A court's "primary objective in interpreting a statute is to give effect to the intent of the legislature." *Brown v. State of Utah*, 308 P.3d 486, 494-95 (Utah 2013). And, in so doing, the court first looks "to its plain language and presume[s] that the legislature used each word advisedly and read each term according to its ordinary and accepted meaning." *Id*.

Plaintiffs argue that the Statute of Repose does not protect a mass-market manufacturer of a heating unit, such as the H-965 Unit, where NuTone had no contact or involvement in any way with the construction of the Motel in which the appliance was used.

NuTone, on the other hand, claims that it was more than a mere supplier; rather, it argues, it contributed to, provided, or performed "construction . . . for or in relation to" the Motel, which is an "improvement." Specifically, NuTone asserts that (1) it manufactured the [H-965 Unit], which was installed in the HVAC mechanical system of Room 108 of the Motel," (2) "courts have consistently found heating, refrigeration and electrical systems to be improvements to real property," [3] and (3) "the [Utah] legislature clearly intend the builders statute of repose to apply to products liability actions when they relate to improvements to real property." *Craftsman*

---

[3] *Qualitex v. Coventry Realty Corp.*, 557 A.2d 850, 852 (R.I. 1989).

*Builder's Supply, Inc. v. Butler Mfg. Co.*, 974 P.2d 1194, 1203 (Utah 1999).

The court agrees with Plaintiffs that third-party, mass-market manufacturers who are not in any way involved in the actual construction of the improvement (here, the Motel), are not protected under the plain language of the Utah Builder's Statute of Repose. To interpret the statutory definition of "providers" to include mass-market manufacturers that, merely through the stream of commerce, have their product used in an improvement, would stretch the statutory language well beyond its plain and ordinary meaning.

NuTone had nothing to do with the construction of the Motel. In other words, NuTone did nothing to contribute to, provide, or perform *construction*. It manufactured a heater/light/fan that happened to be purchased by a contractor or subcontractor for use in the bathrooms of the Motel. To characterize NuTone's involvement as "contributing to or providing or performing construction," is simply an untenable interpretation.

Moreover, if the Utah Legislature had intended to protect such mass-market manufacturers, it could readily have demonstrated such intent by including language to that effect. *See State v. Wallace*, 150 P.3d 540 (Utah 2006). Under the rules of statutory construction, the Utah legislature's failure to include any reference to suppliers, materialmen, or product manufacturers should be presumed to be purposeful. *See Penunuri v. Sundance Partners, Ltd.*, 301 P.3d 984, 989 (Utah 2013).

Additionally, the court is also mindful that the Utah Supreme Court has stated that, the "obvious" intent of the Builder's Statute of Repose was "to end the potential threat of a lawsuit to some *construction professionals*." *Craftsman Builder's Supply, Inc. v. Butler Mfg. Co.*, 974 P.2d 1194, 1199 (Utah 1999) (emphasis added). Pertaining to a previous version of the Statute

7

of Repose, Utah's high court noted that it was enacted in the wake of a nationwide lobbying effort by the American Institute of Architects, the National Society of Professional Engineers, and the Associated General Contractors. *See Horton v. Goldminer's Daughter*, 785 P.2d 1087, 1089-90 (Utah 1989). Accordingly, there is no support for the proposition that the Utah Legislature intended to protect mass-market manufacturers or suppliers. The Utah House floor debates underscore this point by their repeated reference to "people that are involved in the construction and design business," or "engineering and architectural people."[4] Mass-market manufacturers and suppliers such as NuTone do not remotely fit this description.

The majority of courts in other states with similar statutes have held that mass-market manufacturers fall outside the protection of their analogous statutes of repose. *See Uricam Corp. v. W.R. Grace & Co.*, 739 F. Supp. 1493, 1495-96 (W.D. Okla. 1990) (observing that "the majority and clear trend is to construe similar legislation in such a way that manufacturers in the position of defendants in this case are not protected by the statute of repose"). This is particularly true where the state's statutory language and history mirror Utah's. *See id.*; *Rolnick v. Gilson & Sons, Inc.*, 617 A.2d 288, 289-90 (N.J. Super. Ct. App. Div. 1992) (holding that the sale of an installation in a residence of a mass produced, mass marketed attic ventilation fan does not constitute the "design, planning, supervision or construction of an improvement to real property within the meaning of New Jersey's statute of repose); *Luzadder v. Despatch Oven Co.*, 834 F.2d 355, 359 (3d Cir. 1987) (analyzing Pennsylvania's statute and observing that builder's statute was enacted following nationwide lobbying efforts of the American Institute of

---

[4] *See* House Floor Debate Transc., at p. 6, attached as Ex. 29 to Pls.' Appx. 2, Docket No. 112-14.

Architects, the National Society of Professional Engineers, and the Associated General Contractors of America and "meant to protect these groups of people – not manufacturers."); *Ball v. Harnischfeger Corp*., 877 P.2d 45, 47 (Okla. 1994) (recounting legislative history of lobbying efforts by architects, engineers, and contractors, and agreeing with view that providers of mass-produced products do not fall within the protection of statute but finding that manufacturers who act as a designer, planner, construction supervisor or observer, or constructor would be protected under the statute.).

NuTone relies on the Utah Supreme Court's decision in *Craftsman Builder's Supply, Inc. v. Butler Mfg. Co.,* 974 P.2d 1194 (Utah 1999), to support its argument that the Builder's Statute of Repose was meant to apply to products liability actions when, as here, "they relate to improvements in real property." *See Craftsman*, 974 P.2d at 1203. *Craftsman*, however, is readily distinguishable. In that case, the Utah Supreme Court did not have before it an assembly-line supplier, but the builder and the manufacturer of an entire steel building, whose roof had collapsed. *Id*. at 1195. Moreover, the issue presented in the instant motion was never raised in *Craftsman*.

The plaintiff in *Craftsman* had contracted with U.S. Construction for a building that satisfied certain specifications. U.S. Construction then ordered the building from Butler Manufacturing and then erected the building. Craftsman later sued both defendants after the roof collapsed. The district court granted summary judgment in favor of defendants.

On appeal to the Utah Supreme Court, the plaintiff-appellant *Craftsman* never asked the Court to consider whether the Statute of Repose excluded mass-market manufacturers. The appellant simply argued that the Builder's Statute of Repose was unconstitutional, and, if it was

not unconstitutional, then the Court should find that the more specific products liability statute of limitations should apply over the Builder's Statute of Repose for the purposes of its product – an entire building. *Id*. at 1997-1202. It was only this narrow argument that the Utah Supreme Court rejected. Notably, this court is not aware of any Utah case in which the court has applied the Builder's Statute of Repose to preclude claims against a mass-market manufacturer.

NuTone also relies upon *J.H. Westerman Co. v. Fireman's Fund Ins. Co*., 499 A.2d 116 (D.C. 1985), a case in which the court found that a supplier was protected under the applicable statute of repose. But even the *J.H. Westerman* court emphasized that:

> We are aware that the state and federal courts have construed the overwhelming majority of [builders' statutes] to exclude from their coverage product manufacturers and suppliers not otherwise involved in the design of the particular improvement. If the language of [the D.C. statute] were similar to such state statutes, we too might agree . . . that manufacturers are excluded from its protection.

*Id*. at 120-21. In *Westerman*, the District of Columbia court found it significant that Congress had crafted language that was exceptionally broad and inclusive, thereby rejecting the model statute adopted by most jurisdictions. *Id*. at 118, 121. Utah, by contrast, is among the states that relied substantially on the model statute.[5]

---

[5] The model statute provided, in pertinent part, that persons protected included "any person performing or furnishing the design, planning, supervision or observation of construction, or construction of such an improvement more than four years after substantial completion of such an improvement." *See Rose v. Fox Pool Corp*., 643 A.2d 906, 912 (Md. 1994). When the statute was enacted in Utah, the Utah Legislature modified this language only slightly, protecting "any person performing or furnishing the design, planning, surveying, supervising the construction of, or constructing the improvement to real property more than seven years after the completion of construction." *See* Utah Code Ann.§ 78-12-25.5 (1953). The District of Columbia statute at issue in *Westerman* set forth absolutely no identification of or limitation on the class of persons to be protected and instead covered "any action to recover [for harm] resulting from the defective or unsafe condition of an improvement." *Id*. at 118, 121. The court rested its holding on this

In summary, by giving effect to the intent of the Utah Legislature by attributing to words their plain and ordinary meaning, by considering the decision of the Utah Supreme Court in *Craftsman Builder's Supply, Inc. v. Butler Mfg. Co.*, 974 P.2d 1194, 1199 (Utah 1999), and considering the general weight and trend of authority in the relevant area of law, the court concludes that the Utah Supreme Court would find that the Utah Builder's Statute of Repose does not protect third-party, mass-market manufactures of products, such as the H-965, that, merely through the stream of commerce, are used in an improvement to real property. Accordingly, the court finds that the Utah Builder's Statute of Repose does not bar Plaintiffs' claims against NuTone.

**B. Strict Liability for Defective Design**

Plaintiffs' first cause of action is strict liability based on the alleged defective design of the H-965 Unit, including but not limited to the failure by NuTone to equip the H-965 Units with internal thermostats to prevent high temperatures in the room in which they were installed and timing devices to insure that the Appliances would turn off before injury had been inflicted.

In Utah, to prove strict liability because of a defective design, a plaintiff must prove (1) that the defect or defective condition of the product made the product unreasonably dangerous; (2) that the defect was present at the time of the product's sale; and (3) that the defective condition was the cause of the plaintiff's injuries. *Schaerrer v. Stewart's Plaza Pharmacy, Inc.*, 2003 UT 43, 79 P.3d 922, 928 (Utah 2003). A product is "unreasonably dangerous" if it is

> dangerous to an extent beyond which would be contemplated by the ordinary and prudent buyer, consumer, or user of that product in that community considering

---

exceptionally broad language.

> the product's characteristics, propensities, risks, dangers, and uses together with any actual knowledge, training, or experience possessed by that particular buyer, user, or consumer.

Utah Code Ann. § 78B-6-702. To prove that a product is unreasonably dangerous because of a design defect, a plaintiff must prove that an ordinary user would not have realized the extent of danger posed by the product and that an alternative, feasible, and safer design was available at the time the product was sold. *Brown v. Sears, Roebuck & Co.*, 328 F.3d 1274, 1279 (10th Cir. 2003); *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 867 (10th Cir. 2003); *Henrie v. Northrop Grumman Corp.*, 502 F.3d 1228, 1234 (10th Cir. 2007). "The fact that someone was injured while using a product does not establish that the product was unreasonably dangerous when put to its intended use." *Niemela v. Imperial Mfg., Inc.*, 263 P.3d 1191 (Utah 2011). The standard for determining whether a product is "unreasonably dangerous" focuses on consumer expectations. *Id.* at 1195.

The Tenth Circuit has read the Utah products liability statute to encompass both an objective and subjective consumer expectations test. *Id.* (referring to *Brown v. Sears, Roebuck & Co.*, 328 F.3d 1274, 1278–79 (10th Cir.2003)). Under the objective test, a court considers whether an ordinary person would think the product is less dangerous than it is. *Id.* Under the subjective test, a court considers the particular user's expectation of danger given that person's actual knowledge, training or experience. *Id.* If a product is not "unreasonably dangerous" under the objective test, it is not necessary to consider the subjective information regarding that particular person. *Id.*; *see also Brown*, 328 F.3d at 1281-82 (finding that where the injured person is a young child, it is an absurd consequence to examine the product in terms of whether the product is more dangerous than the child would contemplate.).

NuTone argues that, when put to its intended use as a bathroom heater/fan/light, the H-965 Unit is not unreasonably dangerous because Plaintiffs cannot prove that an ordinary person would not have realized the extent of danger posed by the product or would not have thought that the Unit is less dangerous than it is. According to NuTone, an ordinary user of the H-965 Unit would have realized the extent of the danger posed by turning on the heater component of the Unit and leaving it running while a person remained in the small enclosed space. Further, NuTone argues, an ordinary user of the product would also be capable of self-controlling the heat stress to prevent injury, by either removing themselves from the room or by turning off the heater component.

Plaintiff, though, has presented evidence that NuTone designed, manufactured, and sold the H-965 Unit without ever conducting any tests for human safety and hazard control. In addition, NuTone learned from its H-965 performance tests in the 1970's and 1980's that, in as fast as one to two hours, in a room which was double the size of the bathroom where TLT was injured, the Unit could cause the temperature to be as high as 278 degrees Fahrenheit around the Unit itself and anywhere between 115 degrees Fahrenheit to 150 degrees Fahrenheit in other areas of a bathroom. NuTone designed the H-965 Unit to run indefinitely and the only way that the Unit would turn off is if the "thermal protector" protecting the actual motor reached the temperature of 278 degrees Fahrenheit. There was no safety control built in, provided with, required, or even recommended with the H-965 Unit that would in any way prevent it from creating unreasonably dangerous temperatures in the room. Plaintiffs have presented evidence that a thermostat would have made this product safer.

The court finds that there are genuine issues of material fact as to whether the H-965 Unit

was unreasonably dangerous.⁶  Based on the evidence presented by Plaintiffs, a reasonable jury could determine that an "ordinary user" of the NuTone H-965 Unit would fail to appreciate the risk associated with its use.  Specifically, because of the way NuTone designed and sold its product, an "ordinary user" might not have been aware that the Unit was a heating device, let alone that the device was designed to run indefinitely and reach temperatures of 115 °F and even higher, depending on the size of the room.  In making its determination, a jury may consider whether Mr. Thelin's use of the H-965 constituted "misuse" and whether any such misuse was foreseeable to NuTone such that it was bound to anticipate and protect against it.

Defendant, of course, may argue that it took an unforeseeable set of unique circumstances for TLT to have suffered the tragic injuries that she did, including that the H-965 Unit had not been properly maintained in the twenty-six years that it had been installed, that the exhaust fan was no longer working, and that the installation of the switches in Room 108 was not consistent with the wiring diagram provided with the H-965 Unit.  At trial, NuTone may also present evidence of the lack of similar accidents or claims, provided that NuTone provides adequate foundation.  *See Pandit v. American Honda Motor Co., Inc.*, 82 F.3d 376, 380 (10th Cir. 1996).

## C. Strict Liability for Failure to Warn

Plaintiffs have also alleged that NuTone is liable for its failure to warn the public of the dangers inherent in the H-965 Unit, including a failure to label the unit to notify the user that the

---

⁶ Relying on *Gudmundson v. Del Ozone*, 232 P.3d 1059 (Utah 2010), NuTone argues that the "component parts" doctrine compels the entry of summary judgment in its favor on Plaintiffs' strict liability claim.  The court finds that the "component parts" doctrine is not applicable in this case, as the H-965 is the final and complete product that Plaintiffs allege to be defectively designed.  Plaintiffs have not argued that the HVAC system was defective.

subject switch would activate a heater.

Under Utah law, a manufacturer may be held strictly liable for any physical harm caused by its failure to provide adequate warnings regarding the use of its product. *House v. Armour of Am., Inc.*, 929 P.2d 340, 343 (Utah 1996). Where a manufacturer knows or should know of a risk associated with its product, "the absence or inadequacy of warnings renders that product unreasonably dangerous, subjecting the manufacturer to strict liability." *Id*. To establish a claim in strict liability for a failure to warn, a plaintiff must show that (1) the manufacturer knew or should have known of the risk involved, (2) the risk was not disclosed or adequately disclosed, rendering the product unreasonably dangerous, and (3) the failure to provide an adequate warning caused the injury. *Id.* at 343; *Herrod v. Metal Powder Prods.*, 2010 WL 5191923 (10th Cir. Dec. 23, 2010).

NuTone argues that the undisputed evidence demonstrates that it did not–nor should it have–known of this type risk (*i.e.*, that a parent would leave an infant unattended in a bathroom for over an hour with the heating unit operating) resulting from the use of its product. To support its argument that it had no reason to know of this type of risk, NuTone relies on evidence pertaining to the intended use of the H-965 Unit, along with evidence that the Motel has never had a guest injured in the same manner as TLT.

Specifically, NuTone has presented evidence that the Motel has 54 rooms available for rental by guests, and each Motel room has the same H-965 Unit installed in its bathroom. Approximately 1,000 rooms are rented each month at the Motel, and, as such, more than 1,000 people stay at the Motel every month–totaling more than 12,000 people per year. NuTone extrapolates that number to argue that, from 1985 to 2010, more than 300,000 people have rented

rooms at the Motel, and, assuming that each time a room is rented, the H-965 Unit is used only one time, the Units were used approximately 300,000 times from the date of construction of the Motel until the date of the incident, but no similar injuries occurred.

Plaintiffs, however, have demonstrated that there are genuine issues of material fact concerning whether NuTone knew or should have known of the H-965 Unit's potential for hazard and whether a label or warning would have prevented TLT's injuries. In analyzing whether NuTone knew or should have known of the risks involved, Utah courts have warned that foreseeability is not about whether "the particular accident would occur, but only that there is a likelihood of an occurrence of the same general nature." *Steffensen v. Smith's Mgmt. Corp.*, 862 P.2d 1342, 1346 (Utah 1993). Accordingly, a jury must decide whether NuTone is liable, under the law set forth above, for its failure to warn.

## D. Negligence

Plaintiffs have also asserted that NuTone designed, manufactured, tested, distributed and sold the H-965 Unit in a negligent and grossly negligent manner.[7] As a manufacturer, NuTone had a "duty to 'design its product so as to eliminate any unreasonable risk of foreseeable injury.'" *See Creech v. Stryker Corp.*, 2012 WL 33360 at *4 (D. Utah Jan. 6, 2012.)

To prevail on their negligence claim, Plaintiffs must establish that there is a duty of reasonable care owed to Plaintiffs by NuTone. Absent a showing of duty, Plaintiffs cannot recover. *See Slisze v. Stanley-Bostitch*, 979 P.2d 317, 320 (Utah 1999). Under Utah law, the

---

[7] It is possible to bring a negligence and a strict liability claim simultaneously. *Slisze v. Stanley-Bostitch*, 979 P.2d at 319. However, if the product were to be determined defective, recovery under the strict product liability statute would be sufficient to compensate Plaintiffs, making the negligence claim superfluous. *Id*. at 321.

following factors should be considered when ascertaining whether a duty of reasonable care exists: (1) the extent that the manufacturer could foresee that its actions would cause harm; (2) the likelihood of injury; (3) the magnitude of the burden of guarding against it; and (4) the consequences of placing the burden on the defendant. *Id.*

NuTone argues that it owed no duty of care to Plaintiffs because this type of injury was not foreseeable to NuTone.[8] According to NuTone, at the time TLT was injured, Mr. Thelin had not utilized the H-965 Unit for its intended use, and NuTone could not have foreseen that a bathroom would be used as a nursery, that the Unit would be used for ambient noise rather than to heat the bathroom, or that a parent would have left an unattended infant enclosed in a bathroom for over an hour with the heater component of the Unit running. Therefore, NuTone argues, because it could not have foreseen this hazard, it had no duty to Plaintiffs. Additionally, NuTone asserts, the likelihood that this type of injury would occur from use of the Unit is virtually zero, and thus to require NuTone to guard against such an unlikely injury would be unduly burdensome.

The court finds that Plaintiffs have created genuine issues of material fact concerning the foreseeability of the harm, the likelihood of injury, the magnitude of the burden of guarding against it, and the consequences of placing the burden on NuTone. Accordingly, a jury must determine whether NuTone was negligent.

---

[8] While the question of whether a duty exists is ordinarily a question of law, the court finds that genuine issues of material fact preclude the court from resolving this issue, and therefore a jury must decide it. *See AMS Salt Indus., Inc. v. Magnesium Corp. of Am.*, 942 P.2d 315, 319 (Utah 1997).

### E. Breach of Warranty Claims

Plaintiffs' third cause of action is for breach of warranty of merchantability. Both NuTone and Plaintiffs agree that, under Utah law, the elements of strict liability and breach of warranty claims are essentially the same and are indistinguishable from each other. *Creech v. Stryker Corp.*, 2012 WL 33360, at *1 n.2 (D. Utah Jan. 6, 2012); *see also Straub v. Fisher*, 990 P.2d 384, 389, n.1 (Utah 1999). Because the court has determined that Plaintiffs' strict liability claims must be decided by a jury, Plaintiffs' breach of warranty claims must also be decided by a jury.

### CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment [Docket No. 91] is DENIED.

DATED this 16[h] day of October, 2013.

BY THE COURT:

*[signature: Dale A. Kimball]*

DALE A. KIMBALL
United States District Judge